## Case No. 13,914.

### THOMAS v. WEEKS et al.

[2 Paine, 92;[1] 1 Fish. Pat. Rep. 5.]

Circuit Court, S. D. New York. May Term, 1827.

PATENTS—SOLE INVENTOR — JOINT PATENT—PRELIMINARY INJUNCTION—WHEN GRANTED.

1. A patentee can sustain his patent only on the ground of his being the original and sole inventor; and if the idea of the principle of the inventor was, without being executed, suggested to him by another, he cannot claim to be the sole inventor.

2. Semble. That if after the suggestion the patentee reduces the invention to practice, a joint patent should be taken out.

3. To entitle himself to an injunction before a trial at law, the patentee must either show an exclusive possession for such a length of time as to warrant the presumption of right, or show a clear and unquestionable right in the first instance.

[Cited in Cross v. Livermore, 9 Fed. 607.]

[This was a motion for an injunction to restrain the defendants from infringing letters patent for an "improvement in bilge levers for supporting ships," granted to John Thomas, of New York, November 6, 1826. The nature of the improvement, the claim of the patent, and the points involved in controversy are fully set forth in the judge's decision.][2]

J. Oakley and G. Sullivan, for complainant. W. P. Hallett. A. Jay and D. B. Ogden, for defendants.

THOMPSON, Circuit Justice. This is an application for an injunction to restrain the defendants from an infringement of what the complainant claims to be his patent right. The patent bears date on the 6th of November, 1826, and the right claimed is an improvement whereby to support ships in or on dock at the bilge, called "bilge levers." The specification commences with stating that "The improvement claimed, specified and described, consists of a new and useful method[3]

---

[1] [Reported by Elijah Paine, Jr., Esq.]

[2] [From 1 Fish. Pat. Rep. 5.]

[3] Mr. Godson, in his Treatise on Patents, contends that a method is not patentable. He says: "When an invention is not of a thing made, it can only be known by being taught by the inventor himself, or by being learned from experiments made on the faith of the description given of it in the specification. With that assistance, however well the method or process may be set forth, some time and experience must necessarily be required, before a person can make use of the invention so beneficially as the discoverer. But the public are not bound to make experiments, and, therefore, it seems reasonable to infer that a mere process or method cannot be the subject of a patent. But sup-

of supporting the bilge of the ship before she leaves the water, while in fact inaccessible to any other sure support." And after a description of the cradle or carriage upon which the vessel is to rest, and the application of the bilge levers, the specification sums up the improvement claimed as follows: "I describe the specific principle of my invention or improvement claimed to be patented and above described, to be the shoring or supporting vessels when on or in dock at the bilge, by means of levers of the second class, on each

posing it possible that a new method of operating with the hand or a new process to be carried on by known implements or elements, might be so described as to be, by bare inspection, made as beneficial to the public as to the discoverer; that neither time nor labor, skill nor experience, are required to put it in practice; still it is not a substance or thing made by the hands of man; it is not vendible; which is an inherent, primary quality of a new manufacture. The advantages of a method or process, in truth, arise from the skill with which it is performed. Suppose, for instance, that one person can with a certain machine, produce a particular article of dress, of a certain quality; and another, with the same machine, by using it in a different manner, can make the same article in half the time, and reduce it to half the price; however new and ingenious this method may be, still it is nothing substantial or corporeal. But suppose that in thus using the machine, some apparently inconsiderable alteration is made, that would be sufficient to support a patent; and it is indeed difficult to imagine that any beneficial effect could be produced without some material alteration in the instrument itself; and then why not oblige the inventor to take out a patent for the improvement? It is expressly enacted in the statute of 21 James I. that the new manufacture must not be 'hurtful to trade, nor generally inconvenient.' To monopolize such methods as above enumerated, appears to be particularly hurtful to trade. In every branch of it there are workmen who use the machines employed in their respective trades more skilfully than their fellows. This superior skill may be in consequence of a particular method of applying their implements. But it would be carrying the doctrine to a great length to decide that the workmen are entitled to patents for their respective methods of working. And further, every master is bound to teach his apprentice the best way or means within his knowledge, of following his trade. If, therefore, a master obtained a patent for fourteen years, for a particular method of operating with known instruments, to produce a known article in less time than usual, or of making it better and more useful, such apprentice would not be allowed to exercise his hands in the most skilful manner he was able, until several years after he had commenced business for himself. Such a patent would, indeed, be 'generally inconvenient.' There would be a monopoly in every handicraft trade: one person only in each calling would be allowed to work in the most skilful manner. For these reasons—that Dr. Hartley's case is the only one in support of the doctrine, and he did not first make iron, nor first discover the effect of iron on fire, so that he was not the inventor of any substance or instrument—that a method does not possess the qualities which have been shown to be inherent in the subjects of patents, and can be known only by making experiments, and that it is inconvenient to the public, particularly to masters and apprentices, that methods should be monopolized; it might perhaps be fairly inferred, that a method or process is not a new manufacture within the meaning of the statute of monopolies."

The bill alleges that this was a new and useful improvement, and that the complainant was the true inventor thereof, and that prior to the 6th day of November, 1826, he made and constructed, and put in readiness for operation, the said improvement, at the city of New York; and having obtained his patent therefor, the improvement was put in operation under the license of the complainant, and that he became possessed of the exclusive right and liberty of making, constructing, using and vending the same, &c.; and after setting out the infringement complained of by the defendants, the bill prays that they and their agents may be enjoined and prohibited from using the aforesaid improvement on the bilge levers which they or either of them have constructed, in whole or in part, since the 13th day of May, in the year 1827, so ordered or directed to be constructed, and from completing any such bilge levers which they or either of them have at any time in part made or constructed, and from constructing and making hereafter any such bilge levers, without the consent in writing of the complainant.[4]

[4] In the case of Moody v. Fiske [Case No. 9,745], Judge Story says: "Where the inventor claims several distinct and independent improvements in the same machine, and procures a patent for them in the aggregate, he is entitled to recover against any person who shall use any one of the improvements so patented, notwithstanding there has been no violation of the other improvements. There is no doubt, that by the law of England, a party who pirates any part of the invention of a patentee, is liable in damages, notwithstanding he has not violated the whole. It may be that the decisions have turned upon the peculiar language of the English patents; for in all the precedents which I have seen, the patent gives the exclusive right of the whole invention, and prohibits all other persons, 'directly and indirectly to make, use or put in practice, the said invention, or any part of the same, &c., or in anywise to counterfeit, imitate, or resemble the same, or make or cause to be made, any addition thereto, in subtraction from the same.' But as no such intimation is given in the reports, I incline to believe that the doctrine stands upon the general principles of law, that he who has the exclusive right to the whole of a thing, has the same right to all the parts which the general right legally includes; that is, (in cases like the present,) to all the parts which he has invented. The principal difficulty that arises, is in the application of the doctrine; and that may, in most cases, be removed by considering the nature and extent of the patent, or rather of the thing invented and patented. Where the patent goes for the whole of a machine as a new invention, and the machine is, in its structure, substantially new, any person who pirates a part of the machine, substantially new in its structure, deprives the inventor, so far, of his exclusive right in his invention, and may, in a great measure, destroy the value of the patent. Where the patent is for several distinct improvements in an existing machine, or for an improved machine, incorporating several distinct improvements, which are clearly specified, then if a person pirates one of the improvements, he violates the exclusive right of the patentee, for the patent is as broad as the invention, and the invention covers all the improvements; and it is a wrong

The defendants have not as yet put in their answers, but the motion coming before the court on notice, affidavits in support of and against the application have been introduced by the respective parties; and the motion is resisted on two grounds: (1) That if the improvement claimed be new, the complainant is not entitled to it as the first and sole inventor. (2) That it is not, in point of fact, new, but had been for some time in use in England before the complainant obtained his patent, and that it is in principle the same as the bilge blocks or wedges used in "Morton's patent slip," and for which a patent was granted in England in the year 1818.

The rules and principles by which this court is governed, in applications like the present, are laid down in the case of Sullivan v. Redfield [Case No. 13,597]. Whether the patent is good and valid, so as ultimately to secure the right claimed under it, belongs to a court of law, in which the parties have a right of trial by jury. The jurisdiction exercised by a court of equity, in granting an injunction, is in aid of the common law, and should not be asserted when the right was doubtful; and that the court, in granting the injunctions, acts upon the assumption that the right has been infringed, or that little or no doubt exists on that point. When there has been an exclusive possession, for some considerable time, of the patent right, the court will sometimes, on the ground of possession, grant an injunction, without putting the party previously to establish the validity of the patent at law. But when the patent is recent, and any real doubts are entertained of its validity, the court will require that to be established at law before it will grant the patentee the benefit of an injunction. These are believed to be principles well settled in this country and in the English chancery, and to be founded upon the soundest rules of justice and equity.[5]

Does the complainant then bring himself within these rules, either by showing an exclusive possession for such a length of time as to warrant the presumption of right, or by showing a clear and unquestionable right as the first inventor? The patent bears date in November last, and the improvement claimed does not, from the proofs, appear to have been carried into operation, until some time in the spring of 1826; and the complainant does not ask for an injunction to prohibit the use of bilge levers made prior to the 13th day of May last. This is not, therefore, a case which calls upon the court to protect the right, on the ground of possession; and, indeed, it is not easily perceived

---

done to the patentee, to deprive him of his exclusive right in any of his improvements. Where a patent is for a new combination of existing machinery or machines, and does not specify or claim any improvements or invention, except the combination, unless that combination is substantially violated, the patentee is not entitled to any remedy, although parts of the machinery are used by another, because the patent, by its terms, stands upon the combination only. In such a case, proof that the machines, or any part of their structure, existed before, forms no objection to the patent, unless the combination has existed before, for the reason, that the invention is limited to the combination. If there be different and distinct improvements constituting parts of the combination, which are specified as such in the patent and specification, and any one of them be pirated, the same rule seems to apply as in other cases, where part of an invention is pirated: for the patent then shows that the invention is not limited to the mere combination, but includes the particular improvements specified."

[5] Where the right is doubtful, and that doubt can only be removed by a trial at law, there is some plausibility in requiring a party to establish his right before an injunction is granted. But this is not always the course, even in doubtful cases. There are many instances in the books, where the courts have said that posses-

sion, under color of title, is enough to enjoin and continue the injunction until it is proved at law that it is only color, and not real title. The case of Bolton v. Bull, 3 Ves. 140, is one of that description. An injunction had been granted that the question as to the validity of a patent, might be tried in an action at law; and so doubtful was the right of the patentee that the court, upon a case stated, were equally divided. Yet the lord chancellor refused to dissolve the injunction, declaring that he would not put the party to accept a compensation. So, also, in the case of Universities of Oxford and Cambridge v. Richardson, 6 Ves. 707. Lord Eldon, in noticing what fell from Lord Mansfield, in Millar v. Taylor [4 Burrows, 2400], "that it was a universal rule, that if the title is not clear at law, the court will not sustain an injunction," said, that he could not accede to that proposition, so unqualified, for that there had been many instances within his own memory, in which an injunction had been granted, and continued under such circumstances until the hearing. The same doctrine is laid down in the case of Harmer v. Plane, 14 Ves. 132. And the lord chancellor said there would be less inconvenience in granting the injunction, until the legal question could be tried, than in dissolving it at the hazard that the grant of the crown may, in the result, prove to have been valid. That the question was not really between the parties upon the record: for unless the injunction is granted, any person might violate the patent, and the consequence would be that the patentee must be ruined by the litigation. This last observation is entitled to great weight and consideration, and furnishes a strong and cogent reason for granting injunctions in cases of this kind. The prevention of a multiplicity of suits is one of the most salutary powers of a court of equity. These cases are sufficient to show that it is the prevailing practice in England, even where the right is doubtful, and the case is sent to be tried at law, to send it with an injunction instead of denying it on that ground. But where the right is clear, an injunction is never refused; as when the right claimed appears on record, or is founded on an act of parliament, it is matter of course to grant an injunction without first obliging the party to establish his case at law. Cooper, Eq. Pl. 157; Mitf. Eq. Pl. 129. 1 Ves. Sr. 476. In the case of Blanchard v. Hill, 2 Atk. 485. Lord Hardwicke said, that in cases of monopolies, the rule that the court had governed itself by, was whether there was any act of parliament under which the restriction was founded. But the court will never establish a right of this kind, claimed under a charter only from the crown, unless there has been an action to try the right at law. This will be found, on examination, to be a governing distinction, running through the numerous cases cited on the argument. And whenever an injunction has been refused, the right was claimed under a patent from the crown, and that right considered doubtful.

how the complainant can be said to have had any possession, except what arises from the mere grant of the patent. There is no evidence of any recognition of his exclusive title by the purchase of the patent right or otherwise; nor is there anything to show that bilge levers have been practically carried into operation by him, except what is to be drawn from the circumstance of their having been built for the dry dock company, under his superintendence, and whilst he was in their employ at an annual salary, but which is not alleged in the bill as any infringement of the complainant's patent right. If there is anything, therefore, before the court to warrant the granting of an injunction, it must be on the ground that the complainant has clearly and satisfactorily shown himself the first inventor of the improvement claimed. That the patentee can sustain his patent only on the ground of his being the original inventor, is very clear from the language of the patent law of 1793. 2 Bior. & D. Laws, 350 [1 Stat. 322.] The 6th section of that act declares that, if it shall appear that the thing secured by the patent was not originally discovered by the patentee, or that he had surreptitiously obtained a patent for the discovery of another person, the patent shall be declared void; and the patentee, before he can obtain a patent, is required to swear that he believes himself to be the true inventor or discoverer of the thing for which he solicits a patent; and the judicial interpretation which has uniformly been given to this law is, that the patentee must be the first inventor in order to sustain the patent. Odiorne v. Winkley [Case No. 10,432]; Whittemore v. Cutter [Id. 17,600]; [Evans v. Eaton], 3 Wheat. [16 U. S.] 513; Fess. Pat. 47–59, cases collated. It is not intended, upon the present application, to express, nor would I be understood as having formed an opinion, whether or not the complainant is the original inventor of the improvement claimed. This is a question proper to be tried at law, when any reasonable grounds of doubt exist upon that point. It is not pretended, on the part of the complainant, that bilge levers had ever been discovered or used by him previous to his entering into the employment of the dry dock company, in July, 1825, to construct a marine railway; and the plan for supporting the vessel presented by him to the company as an improvement upon Morton's slips, contains no representation of bilge levers. The discovery, therefore, if his, was made during the time he was employed in constructing this railway; and it appears from one of his own witnesses, (Henry Steer,) that the marine rail was ready for hauling up vessels the latter part of February or early in March, 1826, and that the four first vessels hauled up were supported without the bilge levers. The brig Shark, which was the fifth hauled up, was the first to which the bilge levers were applied; and,

from the affidavits of Ezra Weeks, the president, and Samuel Stebbins, junior, the cashier of the New York Dry Dock Company, it appears that, before the bilge levers were constructed or used, it became a matter of common conversation, and doubts were expressed whether vessels could be safely brought on the ways depending on the shear shores alone, which doubts or fears were communicated to the complainant by Stebbins, who mentioned to the complainant that he thought, by placing the end of a piece of timber on the cradle near the keel of the vessel, and raising the other end up, until it should meet the bilge of the vessel, and then supporting it, the vessel would be rendered more secure than by the shear shores alone: that the idea appeared to be new to him: that, in the frequent conversations with him on the subject of shoring and securing vessels on the railway, no mention was made by him of bilge levers; and, from the manner in which this communication was received, the deponents state that they verily believe that the complainant had never thought of constructing bilge levers until the idea was suggested by Stebbins. Whether this can be satisfactorily met and explained by the complainant, is a proper subject of inquiry on a trial at law. As the evidence now stands before the court, the suggestion first came from Stebbins of the use of supports to the bilge of vessels, in principle and substantially the same as that contained in the summary of the complainant's patent, which he described to be "the shoring or supporting vessels when on or in dock at the bilge, by means of levers of the second class on each side, raised to contact or bearing, and effectually propped or sustained."

If the suggestion, as above stated, was first made by Stebbins, and led to the construction and application of bilge levers, as used by the dry dock company, the question arises, how far will this affect the complainant's patent? Without intending to express any definitive opinion on this point on the present occasion, so as to preclude the consideration of it upon the trial at law, I am satisfied it throws so much doubt upon the complainant's right, as to render it improper to grant an injunction until that right has been tried at law.

In Tenant's Case, as reported in Fess. Pat. 162, it is held that the patentee must not only be the inventor, but the first and sole inventor of the thing which is the subject of the patent. In that case the action was brought by Tenant for an infringement of his patent for a bleaching liquor. The action was resisted on two grounds: That the same means for preparing the liquor had been used for some years before the date of the patent; and that the patentee was not the sole and first inventor. And in support of the latter ground, a chemist swore that he had had frequent conversations with Tenant on the means of improving bleaching

liquors, and in one of them had suggested to him that he would probably attain his end by keeping the lime-water constantly agitated; and Tenant afterwards informed the witness that this method had succeeded. This conversation was two years before the patented was obtained. Lord Ellenborough declared the patent to be equally unfounded in law and justice, and nonsuited the plaintiff; and one of the grounds taken was, that the chemist had suggested to Tenant the agitation of the lime-water, which was indispensable to the process; and therefore it was not the invention of the patentee. Here was the mere suggestion of the chemist, which the patentee took up and carried into practical operation. So, in the present case, the suggestion of the use of timbers, substantially in the manner afterwards adopted by Thomas, was first made by Stebbins. The mechanical improvement here suggested was plain and intelligible, and constitutes its whole value. The invention does not consist in the mere form of the application of the timbers to the bilge of the vessel. If Stebbins was the first inventor, he not having taken out any patent does not aid the complainant's right; and if the circumstances are such as to show that they both contributed to the improvement, so as to make them joint inventors, a joint patent should have been taken out. Barret v. Hall [Case No. 1,047].

The application for the injunction is therefore refused, on the ground that it does not satisfactorily appear that the complainant is the first and sole inventor of the improvement claimed to be secured by his patent; and this supersedes the necessity of examining the other objections that have been taken to the validity of the patent. See Langdon v. De Groot [Case No. 8,059]; Goodyear v. Mathews [Id. 5.576]; Morris v. Huntington [Id. 9,831]; Sullivan v. Redfield [Id. 13,597]. Motion denied.

[Patent granted to J. Thomas, November 6, 1826, has not. so far as ascertained. been involved in any other cases reported prior to 1880.]